FILED
United States Court of Appeals
Tenth Circuit

April 18, 2011

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID GERAS,

        Plaintiff–Appellant,

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

        Defendant–Appellee.

No. 10-1352

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 10-CV-00001-WDM-CBS)**

---

Robert M. Liechty of Cross Liechty Lane PC, Greenwood Village, Colorado, for
Plaintiff–Appellant.

Thomas G. Mackey of Jackson Lewis LLP, Los Angeles, California (Jennifer S.
Harpole of Jackson Lewis LLP, Denver, Colorado, with him on the brief), for
Defendant–Appellee.

---

Before **LUCERO**, **McKAY**, and **GORSUCH**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Plaintiff David Geras, a former employee of Defendant IBM, appeals from

the district court's Rule 12(b)(6) dismissal of his contract claims against IBM for

commission payments and separation pay. The district court concluded that

Plaintiff's contract claim for commission payments failed because IBM's employee incentive plan did not constitute an enforceable contract. As for Plaintiff's claim for separation pay, the court concluded that Plaintiff was not entitled to this pay because he had not complied with the requirement to sign a release of claims. This appeal followed.

## BACKGROUND

In his complaint, Plaintiff alleged he worked for IBM from January 2000 until August 15, 2007, and IBM owed him $156,071.98 for commissions accrued in the month of June 2007 and recorded on IBM's web-based Field Management System. He also alleged IBM failed to pay him $35,831.60 in separation pay when he left his employment.

IBM then filed a motion to dismiss, to which it attached the Field Management System letter explaining the incentive plan for the relevant employment period. After setting out the plan details, this incentive letter stated:

### OTHER IMPORTANT INFORMATION

**Right to Modify or Cancel:** The Incentive Plan is described on the Internal Incentive Plan Website . . . , and you should rely on the details provided within the Website for up-to-date information. The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it. IBM reserves the right to adjust the Plan terms, including but not limited to any quotas or target incentives, or to cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related payments have been earned under its terms. . . . Employees should make no assumptions about the impact potential Plan changes may have on their personal situations unless and until any such changes

-2-

are formally announced by IBM.

**Advances Against Final Business Results:**  Because your Plan quotas (or similar performance objectives) are based on a business model dependent on complete, final, and accurate business results, periodic payments you may receive under the Plan are advances. Deductions for overpayments may be made from any advances paid to you up until the payments are earned under the plan terms. Payments are earned at the end of the quarter following the end of your plan period (for example, for some six-month plans, the Plan period ends on June 30 and therefore the payments are earned on the following September 30th . . . ) provided the following conditions have been met: (1) you have complied with the Incentive Plan, the Business Conduct Guidelines and other IBM policies; (2) you have not engaged in any fraud or misrepresentation relating to any of your sales transactions or incentives; (3) the customer has paid the invoice for the sales transaction related to your incentive; and (4) the incentives processes and calculations are final and contain no errors. If any of the foregoing conditions have not been met, then the incentive is not earned.

. . . .

**Significant Transactions:**  IBM Management reserves the right to review and, in its sole discretion, adjust incentive payments associated with transactions which (1) are disproportionate when compared with the territory opportunity or quota size; or for which (2) the incentive payments are disproportionate when compared with the individual's performance contribution towards the transactions.

**Adjustments for Errors:**  IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incentives payments resulting from any errors in incentives processes or calculations.

**Progress Reports:**  Any information regarding Plan achievement that may be made available to employees during the year is provided for information purposes only, and does not constitute a promise by IBM to make any specific distributions to any employee.

(App. at 24-25.)  IBM argued the language of this letter made clear that IBM's

incentive plan did not create an enforceable contractual promise to pay commissions.

In his response to IBM's motion to dismiss, Plaintiff agreed the letter provided by IBM was the relevant document controlling his breach-of-contract claim. However, he argued the language of this letter only gave IBM the right to cancel the incentive plan or adjust the overall plan terms, while IBM had no right to simply withhold commissions for one month in the quarterly plan period. Plaintiff attached an affidavit and other evidence to his reply and argued that the district court should convert the motion to dismiss into a motion for summary judgment because the court needed to consider facts outside the pleadings.

Instead, the district court excluded Plaintiff's proffered evidence and decided under Rule 12(b)(6) that Plaintiff's complaint failed to state a claim on which relief could be granted. The court held as a matter of law that IBM's incentive plan did not constitute an enforceable promise of commission payments. The court also dismissed Plaintiff's claim for separation pay, since Plaintiff did not allege he had signed a release of claims as required by the terms of IBM's separation pay agreement.

## DISCUSSION

As an initial matter, we consider Plaintiff's argument that the district court erred in excluding his proffered evidence, reviewing this decision for abuse of discretion. *See Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232

-4-

F.3d 1334, 1341-42 (10th Cir. 2000). Plaintiff argues the district court should have considered his proffered evidence because the court considered the incentive plan letter submitted by IBM and because his proffered evidence included facts relevant to his claims. We are not persuaded the district court abused its discretion when it considered evidence that was referenced in and central to the complaint while excluding materials outside the pleadings. The court was not required to accept Plaintiff's evidence and convert IBM's motion into a motion for summary judgment simply because the court considered the relevant document setting forth the commission plan alleged in Plaintiff's complaint. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384-85 (10th Cir. 1997) (explaining that a court may consider evidence referenced in and central to the plaintiff's complaint without conversion to summary judgment). Nor was the court required to consider the materials submitted by Plaintiff simply because they included facts relevant to the claims in his complaint. *Cf. Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) (holding that a district court has the discretion in ruling on a Rule 12(b)(6) motion to decline to consider even documents that are referred to in the complaint and central to the plaintiff's claims).

We turn now to the central issue in this case—whether IBM's incentive plan constituted an enforceable promise of commission payments. The parties agree the substantive law of Colorado governs our resolution of this question.

Thus, in the absence of a controlling state court decision, we must attempt to predict what the Colorado Supreme Court would do if faced with this issue. *See Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003).

Under Colorado law, an employee may seek to enforce his employer's personnel policies or procedures under a theory of breach of contract or promissory estoppel. *See Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711-12 (Colo. 1987); *see also Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1322 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). To succeed on a contract theory, the "employee must show that the employer's actions manifested an intent to be bound," while a promissory estoppel theory requires the employee to "demonstrate that the employer should have reasonably expected the employee to consider the policy as a commitment from the employer." *Bullington*, 186 F.3d at 1322. "If the statement is merely a description of the employer's present policies or a forecast of the employee's likely career progression, it is neither a promise nor a statement that could reasonably be relied upon as a commitment." *Soderlun v. Pub. Serv. Co.*, 944 P.2d 616, 620 (Colo. App. 1997). Moreover, under either theory the alleged promise must be "sufficiently specific so that the judiciary can understand the obligation assumed and enforce the promise according to its terms." *Id.*

Plaintiff first argues all of the foregoing authority is inapposite because Colorado courts have only applied these principles in the context of termination

-6-

decisions, where the question is whether policies set forth in an employment

manual or handbook have overcome the rebuttable presumption of at-will

employment.  However, in setting forth Colorado's test for determining whether

employees may enforce such employment policies, the Colorado Supreme Court

held in *Keenan* that this question should be decided under "ordinary contract

principles." 731 P.2d at 711.  The Colorado "[S]upreme [C]ourt has not purported

to create any special rules to deal with employee claims of contract breaches."

*Soderlun*, 944 P.2d at 619; *see also Schur v. Storage Tech. Corp.*, 878 P.2d 51, 53

(Colo. App. 1994) (explaining that the Colorado Supreme Court's reference in

*Keenan* to a presumption of at-will employment did not refer to an evidentiary

presumption, but only emphasized that it was the employee's burden to prove

special circumstances removing his employment situation from the default

position of at-will employment).  We see no reason why the Colorado Supreme

Court would create a special rule for the employment policy at issue in the instant

case, rather than simply apply the traditional contract principles it found

applicable in *Keenan*.  We also note that a prior panel of this court applied these

contract principles to a purported promise of promotions in *Bullington*, outside of

the at-will employment context of *Keenan*, and we have found no Colorado cases

criticizing that application or suggesting *Keenan*'s ruling is limited to the at-will

employment context.  We thus apply the principles described in *Keenan* and its

progeny to determine whether IBM's employee incentive plan constituted an

enforceable promise of commission payments.

IBM argues the disclaimer in its incentive plan—the statement that the letter "does not constitute an express or implied contract or a promise by IBM to make any distributions under it"—defeats any argument that the incentive plan constituted a promise or a statement that could reasonably be relied upon as a commitment from IBM. IBM then argues that the presence of this clear and conspicuous disclaimer renders other portions of the incentive letter irrelevant to the question before us. In response, Plaintiff argues the other language in the letter creates at least an ambiguity as to whether IBM was disclaiming the intent to make any promises at all or whether IBM was instead indicating only that it did not promise to base all distributions on the stated formula since adjustments could be made under certain specified circumstances. Colorado courts have given somewhat inconsistent guidance on whether our review of an employment policy should end if we conclude the policy contains a clear and conspicuous disclaimer of promissory intent or whether other language in the policy may also inform our consideration of the issue. *Compare Jaynes v. Centura Health Corp.*, 148 P.3d 241, 248 (Colo. App. 2006) ("Termination procedures set forth in an employee manual or handbook do not create an implied contract where a clear disclaimer of any contractual rights appears."), *and Ferrera v. Nielsen*, 799 P.2d 458, 461 (Colo. App. 1990) ("Summary judgment denying claims based on a handbook is appropriate if the employer has clearly and conspicuously disclaimed intent to

enter a contract."), *with Evenson v. Colo. Farm Bureau Mut. Ins. Co.*, 879 P.2d 402, 409 (Colo. App. 1993) ("[E]ven if there is a disclaimer in the manual, an employer may nevertheless be found to have manifested an intent to be bound by its terms if the manual contains mandatory termination procedures or requires 'just cause' for termination."). However, we need not decide in the instant case how the Colorado Supreme Court would resolve this question because we conclude, even considering the other language relied on by Plaintiff, that IBM's incentive letter does not manifest an intent to be bound by the terms of its incentive plan, nor could it reasonably be relied on by an employee as a commitment to comply with those terms.

IBM's incentive letter makes clear IBM's intent not to be bound by the policies described therein. We are not persuaded by Plaintiff's argument that IBM's description of situations in which it might make adjustments constituted a promise that adjustments would be made only under those circumstances. Nothing in the incentive letter suggested any circumstances in which the payment of incentives could be considered mandatory, at least not until three months after the end of the plan period at issue.[1] Although the letter contained a description of

---

[1] It is undisputed Plaintiff was informed by August 15, 2007 that he would not receive a commission for June, and it is likewise undisputed that any commission for June would not be considered "earned" under the plan until September 30, 2007, three months after the expiration of the relevant plan period. Thus, this case does not raise the question of whether an employee might succeed

(continued...)

IBM's present policies, including its policies for adjusting payments, it reiterated that IBM retained the discretion to alter or cancel these policies, even after sales had occurred, and it cannot reasonably be construed to be a binding promise or commitment by IBM to provide incentive payments that had not been "earned" under the plan's terms. *See Soderlun*, 944 P.2d at 620; *see also Jaynes*, 148 P.3d at 248-49 (holding that a discretionary policy does not create an implied contract or give rise to estoppel).

This conclusion is consistent with the conclusion reached by the other courts to have considered whether employees may enforce the policies contained in similar IBM incentive plans. In *Jensen v. IBM*, 454 F.3d 382 (4th Cir. 2006), for instance, the Fourth Circuit considered claims based on a similar IBM incentive plan under Virginia law, which applies the same general contract law principles as Colorado. After quoting similar language to the disclaimer language at issue in this case, the Fourth Circuit held that IBM "did not invite a bargain or manifest a 'willingness to enter into a bargain.' To the contrary, it manifested its clear intent to preclude the formation of a contract." *Id.* at 388. The court concluded IBM's incentive plan was "no more than an announcement of a policy expressing its intent to pay incentives in specified amounts but retaining full

---

[1](...continued)
on a contract or promissory estoppel case against IBM for payments that were not refused until after they had been deemed earned under the plan's terms.

discretion to determine amounts until the time that they are actually paid." *Id.* at 390. The court therefore rejected the employee's attempt "to create an enforceable contract out of a policy that expressed IBM's contrary intentions." *Id.*; *see also Schwarzkopf v. IBM*, 2010 U.S. Dist. LEXIS 46813, at *25 (N.D. Cal. May 12, 2010) ("Any inferences that may be drawn in Schwarzkopf's favor with respect to the circumstances or intent of the Quota Letter are insufficient to negate IBM's clear intent *not* to contract . . . ."); *Gilmour v. IBM*, 2009 U.S. Dist. LEXIS 127142, at *3 (C.D. Cal. Dec. 16, 2009) ("Indeed, IBM retained full discretion to 'adjust the Plan terms' at any time. As such, the Incentive Plan and Quota Letter did not create an enforceable employment contract." (citation omitted)); *Rudolph v. IBM*, 2009 U.S. Dist. LEXIS 75261 (N.D. Ill. Aug. 21, 2009) ("Given that Rudolph's 1999 Compensation Plan allowed IBM to unilaterally modify or terminate the Plan at any time, Rudolph could not have reasonably believed that IBM made an offer with respect to incentive compensation.").

We agree with this reasoning and find it equally applicable in the instant case. Because the incentive letter made clear IBM's intent not to enter into an enforceable contract to provide incentive payments, Plaintiff cannot succeed on a contract or promissory estoppel claim based on this letter or the incentive plan it described.

Because we hold that IBM's incentive plan did not create an enforceable

-11-

contract, we need not consider Plaintiff's argument that IBM's refusal to provide a commission payment for his June sales violated the terms of that plan. We also need not consider Plaintiff's argument that IBM's refusal of a commission payment for his June sales violated the duty of good faith and fair dealing that applies to every contract in Colorado. *See Lufti v. Brighton Cmty. Hosp. Ass'n*, 40 P.3d 51, 59 (Colo. App. 2001) ("Here, there was no contract, express or implied, between plaintiff and the hospital concerning his work in the ER. Therefore, no claim for breach of the covenant of good faith and fair dealing may stand."). Likewise, because Plaintiff's arguments relating to his claim of separation pay are entirely dependent on his contract claim for commission payments, our ruling as to that claim disposes of his separation pay claim as well.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.